is appearing on behalf of Mr. Cameron Lynn, who is appealing his conviction from the Northern District of Oklahoma, who is appealing his conviction from the Northern District of Oklahoma on one count of murder and two counts of assault on Indian land and one count of misconduct involving weapons. In this appeal, Mr. Lynn is raising three challenges. The first is to the admission of a document known as Exhibit 59, which was the government's exhibit at trial, and we are challenging that on grounds of federal rules of evidence. And then we are also challenging two instructions that were given to the jury, one on self-defense and the other on imperfect self-defense. The other is on imperfect self-defense. Can I just make sure, I'm not trying to mess up your sequence, but on your first issue, I thought your argument was about particular contents in Exhibit 59, the reference to the 1991 issuance of the CBID card, not the entirety of Exhibit 59. Am I wrong about that? Yes, Your Honor, that is not what we are arguing. Yes, our challenge is to the admission of Exhibit 59 as a record of regularly recorded activity. The entirety? The entirety of the document, because that's all that we have. That is the sole basis for it. We also have his brother that said they were Indians. Your Honor, his brother did say when they were children that they had CDIB cards. However, as this court recently noted in Hartley, the question is whether my client was a member of the Choctaw tribe or an Indian at the time of the crime. And people can be disenrolled from a tribe. It is the government's burden to prove beyond a reasonable doubt that Mr. Lin was an Indian. Do you concede that he was back at the time of the entry on the document? I can't concede that. I can concede that his brother testified to that. I do not know whether it's true or not. I know that there is evidence of that fact. Doesn't this exhibit reflect that this fellow is on the exhibit, therefore he's an Indian? Exhibit 59 is a sheet, a page. It's a page, exactly. It's a page of what? It is a page of a screenshot of the Choctaw Nation's enrollment. And you're saying that maybe he dropped out subsequent to when that page was written? What I'm saying is that the district court erred in admitting that document. So that document was not something that could properly be considered. Was it a business record? Was it introduced as a business record? Yes. And our argument is that it does not satisfy the requirements. What doesn't it satisfy? Well, to begin with, Federal Rule 8036, which is the exception for business records, requires first that the record itself, so we're talking about 59, Exhibit 59. If they brought in the entire book, you wouldn't have a problem? If they brought in the entire file, I have to say, I don't think we would. The book, isn't it a book? From what I understand from the testimony, they called Erica Tomlinson, who was a supervisor with their enrollment department, and she said that they keep the hard copies in their vault. Now, those hard copies would include two documents that I submit could have proven very easily the government's burden of showing that Mr. Lynn was an Indian. One was the Certificate Degree of Indian Blood. It's called a Certificate Degree of Indian Blood, a CDIB. They are also such things as CDIB cards that individuals can carry with them to prove that they are members of the tribe. That is a CDIB, is a self-authenticating document. It has a seal of the United States on it, so that would have been admissible, and that could have been... That would have been in the defendant's possession? It would have been in the prosecution, it would have been in the Choctaw Nation's possession. They would have had the CDIB. They keep the card? Well, the card might be... It might not be the same thing. I might have... The Department of Motor Vehicles might have a record that I am allowed to drive. I also might have a driver's license so that I can show that to people to prove that. But here, they didn't present the CDIB, even though the testimony is that they kept these hard copies in their vault. They also need to prove that he's recognized as a member of a tribe. Now, that was what the purpose of Rule 59 was, to make both of those comments. But the problem was, those comments within Rule 59 were hearsay. They were truth, they were statements that were offered for the truth of the matter that they had asserted. One was... Was the business record. Isn't that an exception? Exactly, Your Honor. But our position is that the government failed to meet the standard for admitting a business record under 8036. Isn't that the core of this appeal? Isn't this a case, really, a rule, a meaning, interpretation of the meaning of the business exception to a hearsay rule? I don't disagree with that, Your Honor. Yes, it's a question about the interpretation of 8036. One of the requirements to get a document in as a business record is that the information recorded in that record must have been recorded at or near the time of the event that it states. And here, the record, which was a screenshot, which we know was created for purposes of this trial, but it was a screenshot of a search of the database of the Choctaw Nation. Did it find the defendant in that screenshot? Yes, this is just that screenshot is of, presumably. And did it say when it was written? The document does not say when it was written. It's an ongoing, it's an ongoing online stream. And don't put any dates in, ever? There were dates, and those dates were, one of the dates was that he got his CDIB in February 1991. So 30 years before. So is it your position that if he tore up his CSID card, threw it away, that this un-Indians him? Not at all, Your Honor, no. Our argument is that this, an element of the crime with which my client was convicted is that he is an Indian. The government must prove that beyond a reasonable doubt. My client... You're doing autopsy, Your Honor. Maybe that would help you? I'm sorry, I interrupted you. Okay, can I ask you a question about harmlessness? So let's put aside Exhibit 59. So as I understand it, Jason says that, yeah, when I was a kid, he is a member of the Choctaw Nation. He has a CBID. He, my brother, does have a CBID card. I've seen it. Ms. Tomlinson says, apart from her extensive testimony about Exhibit 59, says that you only get a CBID card if you have Indian blood, and those are obviously an apprentice, the two requirements for an 1153 to be a member of a federally recognized Native American tribe. And so you're saying, and I don't remember seeing this in this report, I don't remember seeing it in the briefs, that, well, he may have been disenrolled. You know, disproving a negative is quite difficult. How, based on what the evidence was, aside from Exhibit 59, how could a jury have reasonably concluded that the government didn't prove beyond a reasonable doubt that he satisfied both requirements under apprentice because, based on Jason's testimony, that he was a Choctaw Nation member and that he had a CBID card, and Ms. Tomlinson's testimony, that that's only how, the only way to get a CBID card is if you have at least some Indian blood. What would the jury have said back in the deliberation room to say, I quit? Just to clarify, if the Exhibit 59 had not been admitted, they would have said, the only thing that we heard is from his brother, that when they were children, he had a CDIB card. Now, he, the brother, or he, the defendant, he said they both had them, Your Honor, yes, that they both had them, and so that would have been the only evidence that they could have relied on to find beyond a reasonable doubt that my client had a quantum of Indian blood and was recognized by a tribe. Seems pretty good. Well, I mean, would a jury have said, well, you know, you may have been disenrolled, you know, that was just a kid, and, you know, I've heard, you know, my aunt told me a story of a story of a story of somebody that was disenrolled. Well, isn't that a violation of the judge's instructions, presumably, not to rely on, you're confined to the evidence that's presented in the courtroom, and, you know, it seems, I don't know, I just have, I struggle with, it's just a little part of the trial, but I don't know what would have countered it. What it would have counted Jason's testimony? And Ms. Tomlinson's, that's how you get a CBID card. Well, we are challenging the fact, I mean, that was... She testified that that's how you get a CBID card is if you have Indian blood. That is totally independent. I understand. I understand. That's my question. Yes. May I first challenge the hypothetical before I answer it? You can do anything you want. Okay. It doesn't matter for purposes of this appeal. Because the question is, was it an error for the jury to be given this information in Exhibit 59? We can't undo that, right? So the question under the analysis, under the Kodiaka standard, is did the error affect the jury? And it is... Was there an error? That is our argument is that there was. Tell me why it was an error. Because the document that was submitted at Exhibit 59 did not meet the standard for a business record, which requires that the information in that document be entered at or near the time of the information it accounts, it records. Well, the witness testified they filled it out. They did that on everybody as they did it across the board. But it was a screenshot that had dates that are over 30 years old. It could not... She could not testify who entered the documents. There's a good faith situation here too. You have to make a good faith argument that this screenshot was error and the error was not cured by the brother. And I don't see that you're even trying to do that. I mean, what do you want the government to do? I want... The chief of the tribe or...  Ms. Tomlinson, their custodian of records, could have brought to court the actual CDIB that the tribe has in its vault. Well, do you have a position that the screenshot was monkeyed with and that it was not a true and correct representation of what it purported to be? Your Honor, I have no evidence that it was monkeyed with. But during cross-examination, the government's witness said she had no way of knowing. I mean, she said there would have been some security, but she couldn't say. And so the government has to satisfy... Even if they brought in the original record and she said, I can't tell you whether that's really true or not. You'd be in the same exact position. Absolutely not, Your Honor. The original record would be self-authenticating. It would stand for itself. It would not need any authentication. And the government has it. The Choctaw Nation has it and could have brought it to court. And they did not. Instead, they relied on... They relied on a screenshot that does not meet the requirement of 8036. And, Your Honor, I wanted to mention one other thing about your question about the brother's testimony. Recently, and happily, this court, in reversing a conviction for failure to prove Indian status, said it was not even enough that the defendant himself testified at a prior time that he had been a member of the tribe. That was not sufficient. And certainly, Mr. Jason Lynn's testimony about something that may have occurred 20 years previously is not sufficient standing alone, even if that were the standard this court needed to apply. Well, even if she brought in the original record, it wouldn't make any difference to you because it was still 20 years old. And she couldn't say who wrote the entry. Your Honor, I'm about out of time if I could answer that question. You can certainly answer this question. I disagree because if she brought the original record with her, there would have been nothing for us to challenge. It is under 902 of the Federal Rules of Evidence, a self-authenticating document. It says the rules of evidence say it is what it is. But they did not do that. So we would ask the court to reverse the convictions in this case and remand for a new trial. Okay. Before you sit down, I believe my colleague, Judge Abell, has a question. I was concerned about the contemporaneous entry into the record. As I understand it, contemporaneously entered into the record refers to the interval of time between when the enteror, that is the scrivener, got the information and put it into the record. It does not refer to the underlying data when it occurred. Had it been the earth was created four billion years ago, I've just discovered that and I'm entering it right now, that would meet a business test contemporaneous requirement.  It dates to when the scrivener got the information and then put it in the record, not from the date being reported and when it was entered into the record. Absolutely, Your Honor. But the problem here is that Ms. Tomlinson, the government's custodian, could not tell. She did not know. I understand all the rest of the argument. I just want to make that one point. Yes. Make sure I understood your point. Yes. Thank you. Thank you. Thank you. May it please the court, Stephen Bryden on behalf of the United States, I ask you to uphold the jury's verdict and uphold Mr. Lin's conviction for murder and assault because the Indian document that was submitted to the court was admissible under the business records exception. It was not an admissible hearsay and the self-defense instructions that were given to the jury did not mislead them and even if they did, any error was harmless due to the overwhelming nature of the evidence against Mr. Lin. I don't want to mess up your sequence, but when you say that there was no error in the instruction and you can disregard my question if you don't want to talk about that issue, but I had a question. Doesn't that squarely contradict Mary Boy? So there are distinctions between this case and Mary Boy that are important, Your Honor. First, in Mary Boy, the imperfect self-defense instruction, the only information on it was kept inside the involuntary manslaughter instruction. So when this court looked at it in Mary Boy, one of the biggest issues was the way that the jury is instructed, they're not even going to really know about involuntary manslaughter until they've already found that these other three forms of murder didn't apply beyond a reasonable doubt. So that jury doesn't have a chance to look at that instruction and consider it against everything else. Here we do have the standalone involuntary manslaughter instruction. But Judge Federico's rationale was that the elements on first degree murder did not include an element that the government had to disprove imperfect self-defense beyond a reasonable doubt, right? That was the holding in Mary Boy. So in Mary Boy, and I think it's important to have Mary Boy in the context of other cases too, it's that the jury has to understand that they have to disprove it beyond a reasonable doubt. This court in other cases has said that can be in a standalone instruction or that can be in the instruction itself. And the jury in this case was instructed that they had to disprove self-defense beyond a reasonable doubt. And in the imperfect self-defense instruction, there was nothing in that instruction that would lead the jury to believe that the burden was any different. Nor did the court or counsel make any argument to the jury that would find it was different. But ultimately, even if this case does run afoul of Mary Boy because the court and the parties didn't have the opportunity to have this court's instruction or Mary Boy, ultimately the error is harmless because of another significant distinction with Mary Boy, which is that Mary Boy was a second degree murder case. But his argument is that it violates the due process clause and I'm not sure that you have... And that's a due process violation. And so you have to prove it's harmless beyond a reasonable doubt, correct? For an instructional error here, we would have to prove that it's harmless beyond a reasonable doubt. However, we do prove that in our argument. One of the ways that this court has said, this is how to figure out if an error is harmless or not, is the other evidence or is the evidence of guilt overwhelming so that we would believe that this error would not have affected the outcome of the case. And if you look to the Sago case, this court has said that first degree murder is just incompatible with imperfect self-defense. A jury can't both think that somebody acted with deliberation and premeditation, but also think that they may have been reacting unreasonably. I don't think Judge Hart said that. I think he said he specifically folded that within the clause in this case because the person had shot the victim in the back. And so I don't read Sago to say that... And frankly, Mary Boy doesn't read Sago as a categorical preclusion of imperfect self-defense when there's a finding of first degree murder, a finding of premeditation. And I don't argue that it always would be, Your Honor. But if you look at the facts in this case, you have that same level of clear evidence of deliberation and premeditation that existed in Sago that led to the rationale here. The first shots that he fires, that he allegedly fires at the homeless folks who were sitting in the tent who shined a flashlight on him, those were not murder. Those are the individuals who were assaulted. He then makes a decision to... Well, I know, and there's... And so if I'm wrong, tell me if I'm wrong, but Jason says he heard 12 shots. The government finds five casings that are consistent with Lynn's weapon. So, and he tells Jason that the victim, I forget his name, the guy in the other tent, that he had acted aggressively. Well, why can't a jury reasonably infer that some of those shots, some of the, you know, 12 minus five is seven. Some of those seven shots presumably were from the guy and the victim himself who had fired because they couldn't find the other seven casings, right? Because there was never any evidence that more than the shots that were fired by Mr. Lynn were... Well, Jason said that he told him that there were 12 shots, right? Am I wrong a bit? No, you're right. That is what, you know, somebody from a distance testified that they thought they heard that. But when law enforcement gets to the scene, which is very quickly after the shooting, they look through these tents, you know, very thoroughly. They look through the area around very thoroughly. They find the number of shell casings consistent with the reports from the living victims. And they also find holes in the tents that are consistent with the number of shots the living victims said were fired by Mr. Lynn's gun. So while, you know, there may be pieces of testimony that could lead to something different, ultimately beyond a reasonable doubt doesn't mean that it has to disprove every possible doubt. Like we're looking at the reasonable doubts here. And there's no evidence that came into the record during trial that anybody in the tents actually tried to defend themselves or did anything other than shine a flashlight on him. Again, after, and this is important, he comes to the homeless encampment. He has a gun out. He is telling people that he wants his stuff back or he's going to, you know, use his gun. And so, you know, also we're looking at an imperfect self-defense. Imperfect and perfect self-defense are unavailable to a defendant who is the primary aggressor. If you walk into something with your gun drawn. I'm not trying to pick on you, but you said he came to the other encampment wielding a gun. I don't remember testimony to that. I remember him saying, I have a gun. But you're saying that there is evidence that he came out with his gun. Who testified to that? So when the victim who'd been shot, the woman whose name is momentarily leaving me, I apologize, she testified that when they shined the flashlight out his gun was already out. Ultimately, if it's all right with the court, I would move over to some of the Indian status questions. You can do whatever you want. Thanks, Judge. I think it's important to note, you know, in terms of the business records exception, it's something that Judge Kelly mentioned as a part of this assessment is that there is a presumption of regularity with these business records as long as the person who's testifying shows the requisite knowledge. Here, the document that was entered is simply a screenshot of his entry in the tribal database. It's a copy. It would be no different if the government put it on a USB drive. It's just a facsimile of exactly what shows up. And Ms. Tomlinson testified that that is how they manage all the tribal information for their tribe. So if somebody wants to apply, they put them in that system. If somebody were to reach out from an external situation, trying to confirm benefits or something like that, they go to this database. So in the regular course of their business, this is what they use to prove or disprove tribal membership. And while when confronted about the specifics of when information could have been entered in 1991 and 2001, she didn't know the answer, that's not the question asked by the business records exception. The question is, did you understand the process? If we had to bring somebody in who had to testify from memory about how something happened in 1991, it would eviscerate the purpose of the business records exception. Here she testifies that the BIA process, which is what they have to collect to send for the CDIB cards and what they get back from the BIA, has not meaningfully changed since 1979, which clearly encompasses all of the relevant dates involved in this case. Well, can I ask you about that? And this follows Judge Avella's question. So as I understand it, Ms. Tomlinson, you know, she comes in in 2016 and the CBID card, I think she says was issued in 2001. And she does say that the process hasn't meaningfully changed, but she's asked point blank, as I recall, do you know when the tribe received back the CBID card from BIA, and she says, no, I don't really have any idea. You know, and they say, well, what kind of program, you know, what kind of computer program did they, I don't know. And so it seems to me that she doesn't, you know, even with, you know, viewing the evidence favorably in favor of the ruling of admission, it seems to me that there is a question about whether or not she really had personal knowledge about the contemporaneousness of recording that CBID card with the tribe's receipt back of that information from BIA. Well, I think that's important to determine what's the actual document that we're talking about here. So we presented the information from their enrollment. It may have one piece of information in it that's from 1991, but Ms. Tomlinson's testimony about how these database entries get created, she was also asked point blank, has that changed since 2001? And she said, no. And so ultimately, you know, the process by which they get documents, record them in their system, the documents that are necessary, as Ms. Tomlinson laid it out, there's no reason that the documents would change. Did she say no, or did she just simply say, I don't know? She said she had no reason to believe that the process had changed since 2001. Right, that's different than no. That's saying I have no knowledge rather than I have knowledge, and the answer is no. I don't think it's necessarily that, Judge Ebell, because, you know, people don't always answer questions directly, yes or no. But she is somebody who is the manager of the department. She's a manager in that role. And if a change had been made, she would have known about it. And so by her testifying to that, she wasn't aware of the change. What you've just told us, that's not her testimony. That's your testimony. She testified that she was the manager of the program. I don't recall that she said, I, in my current role, I would have known about the practices that were utilized before I came onto my role with the Chalk Foundation. No, and sorry if that was how it came out of my mouth. That wasn't what I meant to say, Judge. What I meant to say was that her saying that she understands how these processes go in her current position inside the tribe could lend a very reasonable judge. And again, we're talking about whether, you know, Judge Frizzell made an erroneous finding of fact here to believe that she would have known about any kind of significant changes. Did she ever say that? Did she say, if there had been a change before I came on with my role with the Chalk Foundation, I would have known about it? I don't recall that she said that. She didn't say that. She said that she had no reason to believe that the process had changed since 2001. It's also difficult on the evidence presented. I don't have any reason to believe that the process has changed either because I don't know anything about it. I mean, that's nothing more than just saying I'm no better off than somebody that has absolutely no evidence or information whatsoever. You have to put that answer, though, in the context of her entire testimony, which was very significant and very detailed on a number of different things. But not very specifically detailed about events before she came onto that role with the Chalk Toss. That is correct. That she did not testify about anything specific about how they would have entered data that had come back from the BIA. That's, isn't that a big deal? You know, so your answer, as I understand it, to Judge Avella is, well, we can infer that prior to 2016 it was the same, but that begs the question, well, what was the practice that didn't change? And so I think what you just said, and tell me if I'm wrong about it, is that she never said that even now that I, Ms. Tomlinson, am there, as soon as we get the BIA card, we do not leave the office before we input the information that we just get promptly into the database, the entry of the CBID card. So it seems to me that, did she say that? And if she didn't, then, okay, it didn't change, but we still don't have a foundation under the business records. So she did clearly testify that the current practice would be when they get the documents back from the BIA, that is when they finalize their enrollment process, by putting them into the computer and by finalizing the application for enrollment in the trial.  Yes. Yeah, there was no testimony about any significant delay. She says that was the practice since she was there with Choctaw. That's correct. And so ultimately, even if that- I never heard, I'm not aware that she ever said, and in my current capacity, I know what they did before I came because it was part of my job to know the history of how they process these things. And I can tell you, they never changed. There was no testimony to that effect here. All she testified to was how the current practice goes and how she had no knowledge that it changed. And that specifically, she had very specific knowledge that the BIA application process of collecting birth certificates, sending them to the BIA, I see that I'm out of time. Yeah, you can certainly continue. I don't want you to make a new argument, but I want you to answer my colleague. In that, the practice of what the BIA requires in terms of sending those documents to the BIA and then getting the approval back, that hadn't changed since 1979, other than the fact that it used to be that they had to send registered copies and the BIA allowed them to send digital copies starting, I think, 2017. And so there is testimony that is affirmative. That would have allowed the court, you know, in making its factual findings here, considering the whole nature of Ms. Tomlinson's testimony, to find that it satisfied the purposes of the business record exception, especially considering there was nothing about the document that would call the contents into question. All right. Thank you. Thank you, Your Honor. Do they have any rebuttal time? No. But timekeeper answers that one. Thank you very much. This matter is submitted. I appreciate the excellent advocacy, both in your briefs, both in your briefs and your arguments today.